[Cite as *State v. Werder*, 2020-Ohio-2865.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                        Court of Appeals No. F-19-008

     Appellee                                   Trial Court No. 18CR000172

v.

Brooke J. Werder                              **DECISION AND JUDGMENT**

     Appellant                                  Decided:  May 8, 2020

* * * * *

Scott A. Haselman, Fulton County Prosecuting Attorney,
for appellee.

Amber VanGunten, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Defendant-appellant, Brooke J. Werder, appeals the June 17, 2019 judgment of the Fulton County Court of Common Pleas, convicting him of aggravated possession of drugs and tampering with evidence, and sentencing him to community control.  For the following reasons, we reverse the trial court judgment.

## I.  Background

{¶ 2} On October 25, 2018, Wauseon Police Officer Kaleb Torbet initiated a stop of Brooke Werder's vehicle for a license plate light violation.  Before exiting his patrol car, Torbet typed Werder's license plate number into a system called Red Hawk, which checks both LEADS (Law Enforcement Automated Data System) and NCIC (National Crime Information Center).  He then approached Werder's vehicle.

{¶ 3} Torbet asked Werder for his driver's license, registration, and proof of insurance.  Werder told Torbet that he maintains insurance through The General, but he did not have proof of insurance in his possession.  He handed over the other information, which Torbet took with him to his patrol vehicle.

{¶ 4} Upon returning to his patrol vehicle, Torbet called off-duty K-9 officer Dawn Huner and asked her if she would walk her dog around Werder's vehicle.  She said she would.  Torbet reviewed the results of the Red Hawk check, which revealed no arrest warrants, and made the choice to issue Werder a warning citation.  He completed the warning citation form then waited in his vehicle for Huner to arrive with the dog.

{¶ 5} Huner arrived minutes later.  Torbet and Huner approached Werder's vehicle together and asked Werder to step outside the vehicle so Huner could walk the dog around the car.  Torbet escorted Werder to the front of his patrol car and questioned him about whether there was anything illegal on his person or in the car.  Werder said there was not.

2.

{¶ 6} The dog alerted to the presence of drugs. Torbet patted Werder down and a packet of drugs either fell out of Werder's pocket or was dropped by Werder. Werder tried to obscure the packet with his foot, but this was observed by another officer who had arrived on the scene. The packet was later tested and determined to be methamphetamine in a quantity less than 0.10 grams. Werder was charged with aggravated possession of drugs, a violation of R.C. 2925.11(A), a fifth-degree felony (Count 1), and tampering with evidence, a violation of R.C. 2921.12(A)(1), a third-degree felony (Count 2).

{¶ 7} On January 14, 2019, Werder moved to suppress evidence obtained during the traffic stop. He argued that he had been unlawfully detained while Torbet waited for Huner to arrive with the canine. The trial court held a hearing. Torbet testified and the video recordings taken from Torbet and Huner's body cameras were admitted. The recording from Huner's dashboard camera was also admitted; Torbet's was not.

{¶ 8} In a written decision filed on March 5, 2019, the trial court denied Werder's motion to suppress. It found that "[b]ased on the totality of circumstances here, the Court cannot conclude that the normal procedures conducted by this officer were delayed for reasons unrelated to the investigation of the traffic violation."

{¶ 9} On March 13, 2019, Werder entered a plea of no contest to both counts of the indictment. The trial court entered a finding of guilty, ordered a presentence investigation report, and continued the matter for sentencing. On June 13, 2019, the trial court sentenced Werder to two years' community control on Count 1 and 12 months' community control on Count 2, to be served concurrently. Werder's conviction and

3.

sentence were memorialized in a judgment entry journalized on June 17, 2019. Werder appealed. He assigns the following errors for our review:

Assignment of Error No. 1:

THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS BECAUSE THE MANIFEST WEIGHT OF THE EVIDENCE DEMONSTRATED THAT THE ARRESTING OFFICER UNREASONABLY PROLONGED THE TRAFFIC STOP IN ORDER TO WAIT FOR THE ARRIVAL OF AN OFF DUTY K-9 OFFICER TO CONDUCT A DRUG SNIFF, THEREBY VIOLATING APPELLANT'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND OHIO CONSTITUTION ARTICLE 1, SECTION 14.

Assignment of Error No. 2:

THE TRIAL COURT ERRED AND PREJUDICED APPELLANT'S RIGHT TO DUE PROCESS BY FINDING HIM GUILTY OF TAMPERING WITH EVIDENCE PURSUANT TO HIS PLEA OF NO CONTEST BECAUSE THERE WAS INSUFFICIENT FACTS OR EVIDENCE IN THE RECORD TO ESTABLISH THAT APPELLANT COMMITTED THAT OFFENSE.

Assignment of Error No. 3:

THE TRIAL COURT'S FAILURE TO STRICTLY AND, OR SUBSTANTIALLY COMPLY WITH CRIM.R. 11(C)(2) IS PREJUDICIAL ERROR AFFECTING A SUBSTANTIAL RIGHT THAT AUTOMATICALLY INVALIDATES APPELLANT'S PLEA.

Assignment of Error No. 4:

TO THE EXTENT THAT THE THIRD ASSIGNMENT OF ERROR MIGHT BE CONSIDERED WAIVED OR INVITED ERROR, IT ALSO CONSTITUTES PLAIN ERROR, WHICH SHOULD BE NOTICED BY THIS COURT AND REMEDIED, IN THAT THE FAILURE OF THE TRIAL COURT TO REQUIRE THE STATE TO ESTABLISH A FACTUAL BASIS TO SUPPORT A FINDING OF GUILT ON A PLEA OF NO CONTEST, CONSTITUTES ERROR THAT SERIOUSLY AFFECTS THE BASIC FAIRNESS, INTEGRITY, OR PUBLIC PERCEPTION OF THE JUDICIAL PROCESS, THEREBY UNDERMINING THE PERCEIVED LEGITIMACY OF THE PROCESS ITSELF.

## II. Law and Analysis

{¶ 10} Werder argues in his first assignment of error that the Fourth-Amendment proscription against unreasonable searches and seizures was violated when Torbet extended the traffic stop without reasonable suspicion to believe that drugs were in the

car. He maintains that Torbet completed the task of writing his warning citation, triple-checked the information, and then sat in his patrol car in the dark for four minutes waiting for the K-9 unit to arrive. Werder insists that Torbet prolonged the stop beyond the time required to complete the mission of the initial stop so that he could explore an unrelated criminal investigation.

{¶ 11} The state maintains that Torbet followed his normal procedures in issuing the warning, and the stop was not delayed for reasons unrelated to the investigation of the traffic violation. It insists that the K-9 unit "commenced its walk around [Werder's] vehicle within the time frame it took Officer Torbet to fulfill the purposes of the traffic stop (the K-9 unit commencing its walk some thirteen minutes after the stop was made)," therefore, the trial court correctly denied Werder's motion to suppress. Alternatively, the state argues that during the course of the stop, reasonable, articulable suspicion of criminal activity arose, justifying Torbet's decision to extend the stop to wait for the K-9 unit to arrive.

{¶ 12} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id*. We, therefore, must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id*. Our role then is to independently determine, without

6.

deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id*.

{¶ 13} Werder does not dispute the legality of the original traffic stop for an inoperable license plate light violation; rather, he argues that he was detained for a period longer than was necessary to carry out the purpose of the original stop. "When conducting the stop of a motor vehicle for a traffic violation, an officer may detain the vehicle for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped." (Internal citations and quotations omitted.) *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138, ¶ 22 (6th Dist.). "This time period includes the time necessary to run a computer check on the driver's license, registration, and vehicle plates." *Id*.

{¶ 14} It is well-established that "[a] K-9 sniff is not a search within the meaning of the Fourth Amendment." *State v. Young*, 6th Dist. Erie No. E-13-011, 2015-Ohio-398, ¶ 29. An officer need not have reasonable suspicion that a car contains drugs before subjecting a lawfully detained vehicle to a K-9 sniff. *Id*. Having said this, reasonable suspicion is required to detain a suspect while a drug sniffing dog is brought to the scene. *Id*. The trial court found here that Werder was detained no longer than was required to investigate the traffic violation and issue a ticket.

7.

**A. Torbet improperly detained Werder while waiting for the K-9 unit to arrive.**

{¶ 15} The U.S. Supreme Court held in *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S.Ct. 1609 191 L.Ed.2d 492 (2015), that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable searches." In *Rodriguez*, a K-9 officer initiated a traffic stop after observing a vehicle veer onto the shoulder of the highway. The officer collected the driver's license, registration, and proof of insurance, and asked him to accompany him to the patrol car. The driver asked if he was required to do so, and the officer told him that he was not. The driver elected to remain in his own vehicle.

{¶ 16} The officer ran a records check on the driver and returned to the vehicle. He then asked the sole passenger for his driver's license and asked him where the two men had come from and where they were going. The passenger told him that they had traveled to Omaha to look at a vehicle that was for sale and were returning to Norfolk. The officer returned again to his patrol car, completed a records check on the passenger, and called for backup. He then began writing a warning ticket for the driving-on-the-shoulder violation.

{¶ 17} The officer returned to the vehicle a third time to issue the written warning. He finished explaining the warning to the driver and returned the documents he had obtained from the men. At that point the officer had "got[ten] all the reason[s] for the stop out of the way." *Id.* at 352. Nevertheless, he then asked for permission to walk his dog around the vehicle. When the driver declined, the officer told him to turn off the

8.

engine and wait in front of the patrol car for a second officer to arrive.  *Id*.  When the second officer arrived, the K-9 officer led his dog around the vehicle twice, and the dog alerted to the presence of drugs.  Approximately seven or eight minutes elapsed from the time the officer issued the written warning until the dog alerted to the presence of drugs.

{¶ 18} The driver was indicted on one count of possession with intent to distribute 50 grams or more of methamphetamine.  He moved to suppress the evidence seized from his car, arguing, among others, that the officer had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff.

{¶ 19} A magistrate judge recommended that the motion be denied.  He found no probable cause to search the vehicle independent of the dog alert and no reasonable suspicion to support the detention once the officer issued the written warning.  He concluded, however, that "extension of the stop by 'seven to eight minutes' for the dog sniff was only a *de minimis* intrusion on [the driver's] Fourth Amendment rights and was therefore permissible."  *Id*. at 353.

{¶ 20} The district court adopted the magistrate judge's factual findings and legal conclusions and denied the motion to suppress.  Like the magistrate judge, the court found that "'dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions.'"  *Id*.  In light of the court's decision, the driver entered a conditional guilty plea and was sentenced to five years in prison.  He appealed to the Eighth Circuit, which affirmed on the basis that the seven to eight minute delay "constituted an acceptable 'de minimis

intrusion on Rodriguez's personal liberty.'" *Id.*, quoting *Rodriguez v. United States*, 741 F.3d 905, 907 (8th Cir.2014). The driver appealed to the U.S. Supreme Court.

{¶ 21} The Supreme Court recognized that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Id.* at 354. It likened the encounter to a *Terry* stop, and cautioned that "the tolerable duration of police inquiries in the traffic-stop context" may "'last no longer than is necessary to effectuate th[at] purpose.'" *Id.*, quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). It explained that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

{¶ 22} The court recognized that during a lawful traffic stop, an officer may conduct certain unrelated checks, but it emphasized that he or she "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. It acknowledged that checking a driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance serve the same objective as enforcement of the traffic code: "ensuring that vehicles on the road are operated safely and responsibly." *Id.* But it found that the objective of a dog sniff, on the other hand, is to uncover evidence of "ordinary criminal wrongdoing" and "is not an ordinary incident of a traffic stop." *Id.* at 355-356.

{¶ 23} The state argued that "an officer may 'incremental[ly]' prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the

10.

traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." The court rejected the state's position, which it interpreted as advocating for "bonus time" to pursue unrelated criminal investigations where an officer has completed his or her traffic-related tasks expeditiously. The court explained that "[t]he reasonableness of a seizure * * * depends on what the police *in fact* do." (Emphasis added.) *Id*. at 356. It held that a traffic stop prolonged beyond the amount of time reasonably required to complete the stop's mission is unlawful. To that end, it clarified that a dog sniff that adds time to the stop violates the Fourth Amendment.

{¶ 24} This court has not yet had occasion to apply *Rodriguez*, but several other districts have. In *State v. Green*, 2016-Ohio-4810, 69 N.E.3d 59 (7th Dist.), for instance, the officer initiated a traffic stop for a loud exhaust. He summonsed a K-9 unit to perform a sniff of the vehicle. It took the officer approximately one to two minutes to write a warning citation for the defective exhaust system, the K-9 unit arrived in less than ten minutes, and the dog took approximately three minutes to complete the sniff. The dog alerted to the presence of drugs in the vehicle. The defendant moved to suppress the evidence and the trial court denied the motion. The defendant appealed. The Seventh District reversed. It concluded that under *Rodriguez*, "the dog sniff extended the stop beyond the time reasonably required to complete the traffic investigation for a loud exhaust." *Id*. at ¶ 20.

{¶ 25} The Second District reached a similar conclusion in *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276 (2d Dist.), where a dog sniff eventually led to the discovery of drug-related contraband. There, the officer stopped the defendant's vehicle after watching it roll past two stop signs. The officer asked for identification from the driver and his two passengers. The driver and front-seat passenger did not have their identifications with them, so he asked their names and dates of birth to confirm their identities. The officer misheard the driver; he thought his first name was "Tyler" but it was actually "Taylor." Because of this misunderstanding, the officer had to return to the car to request the driver's social security number, which resulted in a correct identification.

{¶ 26} While he was in the process of confirming the driver's identity, the officer summonsed a canine unit to perform a drug sniff. Before the dog got there, another unit arrived to assist and advised the officer to "stall them." *Id.* at ¶ 4. The officer, therefore, did nothing to process the traffic stop for approximately eight minutes and simply stood on the sidewalk waiting for the canine unit to arrive. He later explained that he was "deliberating" about whether to issue a citation or a warning. He said that it usually takes him 12-13 minutes to complete a traffic stop when he issues a citation.

{¶ 27} The driver moved to suppress the evidence against him, and the trial court granted his motion. The state appealed. The Second District affirmed. It acknowledged that it was necessary to confirm the driver's identity and it accepted that there had been a legitimate misunderstanding as to the driver's first name, which the officer appropriately

12.

clarified. But it concluded that even giving the officer the benefit of that additional time, "the traffic stop was not 'expediently completed'" and "the officer delayed it to obtain a canine sniff." *Id*. at ¶ 11. It found that "the officer acted neither reasonably nor diligently by doing nothing for eight minutes while awaiting a canine unit," and "the sniff in this case indisputably added time to the stop." *Id*. at ¶ 13.

{¶ 28} Here, the trial court concluded that Torbet did not delay his normal procedures for reasons unrelated to the investigation of the traffic violation. Believing Torbet's testimony at the suppression hearing, the court found that Torbet was "working on the traffic warning" and "the procedures he followed in this case were the same that he follows in all other cases."

{¶ 29} In reviewing a trial court's denial of a motion to suppress evidence, we generally accept the trial court's findings of fact if they are supported by competent, credible evidence. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. We usually defer to the fact-finder because it is the fact-finder who is able to see the witnesses testify, observe their facial expressions and body language, hear their voice inflections, and discern qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 30} Torbet was asked at the suppression hearing if he "sat writing the warning in [his] unit until [the K-9 officer] got there." He responded: "Affirmative." But we have the benefit here of being able to view the video recording taken from Torbet's body

13.

camera—which Torbet confirmed was an accurate representation of what happened that night—and it shows otherwise.

{¶ 31} The video footage from Torbet's body camera begins just after he initiated the stop. Shortly after the recording starts, he can be seen typing something (Werder's license plate number, he testified) into his computer. The following is a timeline of what is depicted on the recording:

0:28: Torbet exits the patrol vehicle.

0:41: Torbet reaches the driver's side of Werder's vehicle. He explains to Werder why he pulled him over.

0:54: Torbet asks Werder for his license, registration, and proof of insurance. Werder hands him his license and registration, but tells him that he does not have his insurance card with him. He says that he is insured through The General.

2:12: Torbet gets back into his vehicle. He scrolls through his phone looking for a phone number, then calls off-duty K-9 officer Dawn Huner.

3:46: Huner answers Torbet's phone call. Torbet asks "Hey are you home? Would you be up for a walk? I have Brooke Werder on a traffic stop." Huner apparently responds affirmatively and he tells her the location. The phone call ends at 4:03.

14.

4:04:  Torbet views the results from the license plate check that he entered at the beginning of the traffic stop.

5:47:  Torbet turns on the light in the cruiser and begins writing a warning notice.

8:34:  Torbet completes the warning citation and turns off the light.  He sits in his vehicle in the dark listening to music and waiting for Huner to arrive with the dog.  While he is waiting, he radios dispatch for Huner's status.

12:15:  Huner arrives and Torbet exits the vehicle.

**{¶ 32}** Contrary to the trial court's conclusion, the recording from Torbet's body camera clearly shows that he completed the basic warning notice form in under three minutes, then sat in his patrol car in the dark for almost four minutes waiting for Huner to arrive.[1]  We, therefore, cannot agree with the trial court that Torbet was "working on the traffic warning."  *See Middleburg Hts. v. Wojciechowski*, 8th Dist. Cuyahoga No. 102216, 2015-Ohio-3879, ¶ 18 (concluding that trial court's judgment was not supported by competent, credible evidence where there were ostensible discrepancies between the officer's testimony and video evidence).  While four minutes may seem like a de minimis intrusion, it prolonged the stop beyond the amount of time that was "in fact" required to complete the stop's mission.  Under *Rodriguez,* it was, therefore, unlawful.

---

[1] Torbet also testified that during this time, he was watching for Werder to make furtive movements.

{¶ 33} Accordingly, we agree with Werder that in the absence of reasonable suspicion to believe there were unlawful drugs in the vehicle, his Fourth Amendment rights were violated when Torbet extended the stop to wait for the K-9 unit to arrive.

**B. The state did not argue in the trial court that Torbet had reasonable suspicion of criminal activity.**

{¶ 34} The state argues that even if this court finds that the stop was delayed for reasons unrelated to the investigation of the traffic violation, we should nevertheless affirm the trial court judgment because Werder had reasonable suspicion of criminal activity justifying his detention of Werder pending arrival of the K-9 unit.

{¶ 35} At the suppression hearing, Torbet testified that when he approached Werder's vehicle, he noticed numerous air fresheners hanging from the rear view mirror and a police scanner in the back seat. In addition to this, Torbet said that he knew that Werder had been evicted from an apartment for suspected drug use and that there had been allegations by Children's Services that Werder abused drugs. Torbet testified that he escorted a Jobs and Family Services employee to Werder's apartment a month earlier and was advised at that time that Werder used methamphetamine.

{¶ 36} Torbet conceded at the suppression hearing that he did not smell drugs or alcohol, Werder did not appear to be impaired, his eyes were not bloodshot, and the police scanner was not on. He also conceded that there was no indicia of any current marijuana or alcohol use, but he emphasized that he had been told that Werder's drug of choice was not marijuana, but rather methamphetamines.

16.

{¶ 37} The trial court did not address whether Torbet had reasonable, articulable suspicion of criminal activity to justify extending the stop. Importantly, the state never raised this argument in the trial court. "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 2019-Ohio-5156, -- N.E.3d -- , ¶ 10 (finding that state could not assert standing argument on appeal when it failed to raise the argument in the trial court in opposing defendant's motion to suppress). "This waiver rule applies to arguments not asserted either in a written motion to suppress or at a suppression hearing." *State v. Geiger*, 10th Dist. Franklin No. 15AP-1120, 2016-Ohio-7571, ¶ 12-13, citing *State v. Johnson*, 10th Dist. Franklin No. 13AP-637, 2014-Ohio-671, ¶ 14.

{¶ 38} In its opening statement at the suppression hearing, the assistant prosecutor introduced the state's argument: "while the Defense argues that the officer unreasonable [sic] extended the purpose of the stop, I believe the evidence will show otherwise. While the officer was waiting for the K-9 to arrive he was filling out a written warning to the Defendant which used up virtually all the time that it took for that K-9 to arrive." The state did not argue that reasonable, articulable suspicion of criminal activity arose during the traffic stop to justify further detaining Werder; it made no closing argument and filed no brief in opposition to Werder's motion to suppress, despite the trial court's apparent willingness to allow it to do so ("Do you want an opportunity to Brief?").

{¶ 39} Because the state failed to argue in the trial court that reasonable, articulable suspicion of criminal activity arose during the stop, we decline to address this

17.

argument on appeal or remand the issue to the trial court. *See State v. Barnett*, 2018-Ohio-2486, 114 N.E.3d 773, ¶ 18 (7th Dist.) ("[T]he state failed to raise this issue with the trial court in its original response to appellee's motion to suppress, the suppression hearing itself, or in its response brief after the hearing on the motion to suppress. * * * Because the state did not raise the attenuation doctrine argument with the trial court, such argument will not be considered in this appeal."); *State v. Hetrick*, 9th Dist. Lorain No. 07CA009231, 2008-Ohio-1455, ¶ 16 (concluding that state waived argument by failing to raise it in trial court in opposition to defendant's motion to suppress).

{¶ 40} Accordingly, we conclude that the trial court erred in denying Werder's motion to suppress, and we find Werder's first assignment of error well-taken. In light of this conclusion, we deny as moot Werder's remaining assignments of error.

### III. Conclusion

{¶ 41} We conclude that Werder's Fourth-Amendment rights were violated when Torbet extended the traffic stop to wait for the K-9 unit to arrive. We find Werder's first assignment of error well-taken. Our conclusion with respect to Werder's first assignment of error renders his remaining assignments of error moot.

{¶ 42} We reverse the June 17, 2019 judgment of the Fulton County Court of Common Pleas and remand this matter to the trial court for further proceedings consistent with this decision. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                               _____
                                                         JUDGE

Christine E. Mayle, J.

                               _____
Gene A. Zmuda, P.J.                                   JUDGE
CONCUR.

                               _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.